IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MARSHALL JOINT SCHOOL
DISTRICT NO. 2,

                    Plaintiff,                 OPINION AND ORDER

           v.                            08-cv-187-bbc

C.D., by and through his parents,
Brian and Traci D.,

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      Plaintiff Marshall Joint School District No. 2 brought this lawsuit under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1487, and Wisconsin state special education law, Wis. Stat. Ch. 115, challenging the determination of a state administrative law judge, who rejected the school district's contention that defendant C.D., a third grade student, no longer needs special education services to respond to his medical condition of Ehlers-Danlos Syndrome.  Jurisdiction is present.  20 U.S.C. § 1415(i)(3)(A); 28 U.S.C. § 1331.  Before the court is the school district's motion for summary judgment. Dkt. #27.

1

The school district contends that the administrative law judge erred in finding that C.D. was a "child with a disability" because she 1) applied the wrong legal standard; 2) failed to give due weight to the opinions of the educational experts on C.D.'s individualized education program team; and 3) improperly relied on the testimony of a witness with an expired professional license.  The school district also submitted what it asserts to be new evidence for the court to consider, arguing that this court must review the administration decision *de novo*.  C.D. opposes the summary judgment motion, disputes the assertion that there is new evidence before the court and requests that the court affirm the administrative decision and hold an evidentiary hearing to determine what special education the school district must provide C.D. under the Individuals with Disabilities Education Act.  In a related motion, C.D. also requests that the court grant him permission to file his proposed findings of fact *nunc pro tunc*, averring that he inadvertently filed the document three days late because of a clerical error.  Dkt. #32.

Relying on the preponderance of the evidence and giving due weight to the administrative law judge's decision, I find that C.D. has an "other health impairment" and, by reason of that impairment, needs special education and related services.  For these reasons, I am denying the school district's motion for summary judgment and affirming the decision of the administrative law judge.  Because the school district has not opposed the late filing of C.D.'s proposed findings of fact, his motion to file them *nunc pro tunc* is granted.

2

Finally, the school district's request that this court admit new evidence is denied because the evidence in question is either irrelevant or already part of the administrative record.

From the parties' proposed findings of fact and the administrative record, I find that there is no genuine dispute as to the following material facts.

## UNDISPUTED FACTS

### A. Background

Plaintiff Marshall Joint School District No. 2 is a body politic incorporated, organized and operated pursuant to Wisconsin law with an office in Marshall, Wisconsin. The school district receives funding under the Individuals with Disabilities Education Improvement Act (IDEA). Defendant C.D. is a nine-year old boy (date of birth July 15, 1999). At all times relevant to this lawsuit, C.D. has resided with his parents, Brian and Traci D., within the Marshall School District.

In 2004, Dr. David Bick at the Medical College of Wisconsin and the Children's Hospital of Wisconsin in Milwaukee, Wisconsin, tested and diagnosed C.D. with Ehlers-Danlos Syndrome hypermobile type, which is a genetic, generalized connective tissue disorder that causes C.D. to experience joint hypermobility, poor upper body strength, poor postural and trunk stability, chronic and intermittent pain and fatigue, hypotonic muscles and gastrointestinal problems. C.D. received adaptive physical education services, physical

3

and occupational therapy, assistive technology, supplemental aids and services and program modifications at school throughout kindergarten, first grade and most of his second-grade year.

Under an individualized education program developed on January 27, 2006, C.D. received adaptive physical education, occupational therapy and physical therapy. The school district also modified C.D.'s regular academic classes to provide the following supplementary aids and services: frequent bathroom breaks; positioning aids; extra time to complete academics; motor and self-help tasks; checking for understanding; providing directions and problems orally; visuals (such as number lines and schedules); fine motor adaptations (tape recorder, dictation and limited writing assignments); consultation between the adaptive physical education teacher and the regular physical education teacher before each physical education class; and consultation between the occupational therapist, physical therapist and special area teachers at least 15 minutes a month. In the classroom, C.D. used a floor rocker to help conserve his energy, a special chair at work tables and a slant board and adaptive writing tools as positioning aides. When C.D. moved around the school, he had to ride in a wagon because walking made him too fatigued.

At the end of C.D.'s first grade year, Stephanie Pingel, C.D.'s adaptive physical education teacher, observed that C.D.'s skills and the fatigue that he experienced at the end of class were comparable to that of his peers. C.D. achieved three out of five short term

4

objectives related to his participation in regular physical education classes, including learning to avoid joint jamming activities, monitoring his body for fatigue and coordinating the simultaneous movement of his arms and legs in certain activities.

### B. Second Grade (2006-2007)

On September 25, 2006, Traci D. and Donna Au, the school physical therapist, accompanied C.D. to an appointment with Dr. Nathan Rudin, a doctor in the Department of Orthopedics and Rehabilitation Medicine at the University of Wisconsin School of Medicine and Public Health. Although C.D. was Dr. Rudin's first pediatric patient with Ehlers-Danlos Syndrome, he had worked a great deal in this area for several years and served as a medical advisor for an Ehlers-Danlos Syndrome support group in Madison, Wisconsin. Upon examination, he noted that C.D. collapsed into a "flexed hyperkyphotic posture while sitting or standing." Dr. Rudin recommended that C.D. undergo physical therapy because he had poor strength in his core muscles, his abdominal and buttock muscles and the muscles supporting his spine. He wanted C.D. to strengthen those muscles so that he could walk and perform other activities more comfortably. After that, Dr. Rudin planned to add exercises that would stabilize C.D.'s posture and help reduce the load on his joints. It was Dr. Rudin's opinion that with respect to gym activity, C.D. should avoid extremely high-impact activities

5

(running on uneven terrains, football, soccer and dodge ball) and work on his ankle strength to reduce his risk of sprains.

Pingel understood Dr. Rudin's recommendations to mean that C.D. could continue to participate in normal activities in his physical education class as long as he did not perform high-impact activities. She did not specially design the second grade physical education curriculum for C.D. other than limiting the number of times he repeated an activity or otherwise having him limit or avoid the activity. Pingel continued to provide C.D. with adaptive physical education six times a month during his physical education class. C.D. ran only for limited periods and did not participate in any physical education activity that would "over pound" his joints. Pingel met with the regular physical education teacher once a week to plan C.D.'s participation in the class. She also conferred regularly with the school physical therapist about modifying C.D.'s physical education activities. Pingel did not observe C.D. get fatigued between September and December 2006 because he either slowed down or took a break. According to Pingel, C.D.'s fatigue at the end of his physical education class looked like that of his peers.

Although C.D. had signed up to play basketball in the fall of 2006, he never played because he fractured his arm in November 2006. He also was quite ill from November 2006 through January 2007 with a sinus infection and pneumonia. Tracy Buechner, C.D.'s first and second grade teacher, closely monitored C.D.'s fatigue during his recovery period and

6

provided him with regular opportunities to rest. Buechner provided him with positioning devices in her classroom and was attentive to activities that might fatigue him, such as handwriting and sitting too long. (All first and second grade classrooms have two rockers for teachers to use when students have trouble sitting still.)

In November 2006, Buechner told Traci D. that she was very concerned about C.D.'s progress in reading and spelling. The school district referred C.D. to Jackie Motl, a reading specialist in its Title I reading program (which is not a special education program). Because of the concerns with C.D.'s reading and spelling abilities, Traci D. asked for an individualized education program team meeting in December 2006.

C.  The School District's Reevaluation of C.D.

1.  December 2006 and January 2007 team meetings

On December 21, 2006, the following members of C.D.'s individualized education program team met to discuss C.D.'s reading and spelling levels: Jody Koch, the school psychologist and special education coordinator; T.J. Hansen, the school social worker; Sara Kerwin, the special education teacher; Motl, the reading specialist; Pingel; Andrea Kuhl, the school occupational therapist; Traci D.; and Buechner. After testing C.D. in phonics, phonemic awareness, spelling and decoding, Motl reported that C.D. was in the guided reading level range for second grade. After listening to these results and hearing from

7

Buechner, Kerwin concluded that C.D.'s academic performance was in the range that one would expect for a child of his age. The team discussed having C.D. stay in for lunch recess two to three days a week to help reduce his fatigue. They noted that C.D. was not using the wagon or scooter for transportation around campus or the elevator in lieu of stairs.

On January 19, 2007, Koch, Au, Kuhl, Pingel, Motl, Buechner and Traci and Brian D. met and discussed C.D.'s physical education. At that time, the physical education curriculum used by Pingel included tag, jumping jacks, running, jogging and group games. She agreed that her second grade curriculum for C.D. was not consistent with Dr. Trapane's recommendations. Before the January 2007 meeting, Pingel provided C.D.'s parents a list of modifications to the second grade physical education curriculum, including wall push ups, no crawling under other children's legs during "wizard tag," avoiding sit ups as a warm up, gradually increasing running to two minutes at a time, playing goalie to conserve C.D.'s energy during soccer or hockey, reducing his need to run during "alien dodgeball" by having the teacher intervene in the game periodically, letting his partner run during relay races or the treasure island game and having him sit down if he became fatigued.

At the January meeting, Au, Kuhl and Pingel presented reports on the evaluations that they had performed on C.D. regarding his developmental needs. Au saw C.D. twice a week for 20 to 30 minutes a session and worked on mobility, stretching and joint protection measures. She reported that on a standardized motor skills test, C.D. ranked in the 58th

8

percentile in manual coordination (average), the 12th percentile in body coordination (below average) and the 24th percentile in strength and agility (low average).  She wrote that she was concerned "that [C.D.] may not have been able to perform within the average range had assessment been completed in the afternoon."  Au explained later that she wrote this because people had reported to her in December 2006 that C.D. had more difficulties in the afternoon.  She admitted that most of these reports came from Traci D.  Given C.D.'s medical history, fragile health status, high fatigue, poor endurance and his symptoms' effect on his academic performance, Au concluded that he needed physical therapy focused on joint protection, energy conservation, increasing proximal strength and stability (to increase his core strength) and modulating movement patterns to reduce joint injuries.  In her report, Au stated that she would need to help make adaptations and accommodations to his activities throughout the school day.

Kuhl provided school-based occupational therapy to C.D. twice a week for 20 to 30 minutes at a time.  She taught C.D. to monitor his activities to protect his joints and conserve his energy and worked with him to strengthen his shoulders, arms, hands and trunk.  Kuhl administered standardized tests to assess C.D.'s visual motor integration and visual perceptual skills.  Although C.D. tested in the average range overall, Kuhl reported that he continued to struggle with attention, self-regulation of his arousal and alertness, endurance and fatigue.  She wrote that his ability to demonstrate learned skills was very

dependent on how he was feeling in relation to his Ehlers-Danlos Syndrome.  She noted that there were "ongoing concerns with his low muscle tone, limited endurance, trunk, strength, poor postural stability, joint laxity and sensory issues." Kuhl explained that these difficulties affected his ability to perform school-related activities successfully.

Pingel administered a standardized test to assess C.D.'s gross motor abilities.  C.D. scored in the 37th percentile in locomotor abilities and in the 63rd percentile in object control (hitting, catching, throwing and dribbling a ball).  Because C.D.'s gross motor quotient was 100, Pingel concluded that he was in the average range, was able to keep up with his peers and could participate fully in physical education.  The standardized instructions for the test indicate that students with a gross quotient of 70 or less would be considered in need of adaptive physical education.  In reaching her conclusion, Pingel also relied on classroom observations and health provider reports.  She reported that C.D. had made huge gains, was able to do things he had not been able to do previously and could coordinate his body and perform local motor and object control skills in the average range. By the end of the second quarter of the 2006 to 2007 school year, C.D. had attained the two objectives for which Pingel was responsible.

Traci and Brian D. were upset that C.D. was participating in any type of running activity; they thought that he should not be doing so.  They told the school district that Dr. Rudin would be managing C.D.'s case and that any questions should go through him.  The

10

team decided to have C.D. rest and stay indoors during the longer lunch recess.  Koch also explained that they wanted to clarify the contradictions between the restrictions that C.D.'s parents were reporting and those made by C.D.'s pediatrician and Dr. Rudin (no high impact activities).  The team thought that the physicians' reports commenting on C.D.'s educational performance were not accurate because they differed from the school staff's observations of his functioning.

2.  Physician assessments

In a letter dated January 12, 2007, Dr. Amy Plumb, C.D.'s pediatrician, wrote that C.D. intermittently suffered from fatigue, weakness, irritability and difficulty concentrating. She noted that for the previous two years, C.D. had been healthy and had not required frequent office visits.  However, she reported that C.D. had been more fatigued and irritable and had undergone three courses of antibiotics in the 2006 to 2007 school year.  Dr. Plumb recommended that the physical education teacher modify high-impact activities for C.D., including decreasing the repetition of activities that stressed his joints and running shorter distances or for less time.  She also recommended that he stay indoors during the 30-minute recess period during the winter months.

11

On January 24, 2007, Dr. Pamela Trapane saw C.D. for evaluation and genetic counseling.  She obtained information from Traci D. and C.D.'s medical records.  In her report under the heading "Developmental History," Dr. Trapane wrote:

> There is some difficulty with modifying his curriculum for adaptive physical education.  Currently, physical education occurs at the beginning of his day which then has a negative impact on the rest of his day. . . . There is concern that [C.D.'s] fatigability and poor endurance are impacting his ability to attend as the day wears on and thus his academic progress.

After a 10 to 15 minute examination, she concluded that C.D. did not have any motor delays or gross deficiencies or excessive mobility of his large joints.  However, she noted that he was not cured and that "[i]t will be important for [C.D.] to have a modified physical education program and modified curriculum to meet his physical needs."  Dr. Trapane wrote that the major issues related to Ehlers-Danlos Syndrome are chronic pain and fatigue resulting from chronic joint instability and associated joint damage.  "[P]hysical movement that involves high impact and high static demand cause the joints to collapse . . .  This damage is ongoing and cumulative."  She recommended adaptive physical education involving joint protection with low impact activity and muscle strengthening and modifications in the classroom to support joint protection and decrease fatigue.

C.D. also saw Dr. Rudin on January 24, 2007.  Dr. Rudin reported that his findings "were essentially identical" to his previous ones and did not further restrict C.D.'s physical activities.  Both Dr. Rudin and Dr. Trapane stated the opinion that C.D. could not

12

participate fully and safely in regular physical education classes without adaptations or modifications.

In a report dated January 28, 2007, Susan Kratz, C.D.'s private occupational therapist, made recommendations to C.D.'s school.  She noted that C.D. was having difficulty dealing with sensory stimulation.  C.D. had reported severe headaches, near constant stomach pain and hurting all over and he had dark circles under his eyes, a sunken or grayish pallor and looked lethargic at times.  Kratz noted that when C.D. had a lot of pain, he had to be carried up the stairs, in and out of the car and in the school hallways.

On January 30 and February 1, 2007, Dr. Nancy Viscovich, a neuropsychologist at Dean Medical Center in Madison, Wisconsin, evaluated C.D. to assess his cognitive functioning.  C.D. tested in the average range.  Although Dr. Viscovich diagnosed attention deficit hyperactivity disorder–inattentive type, she concluded that C.D.'s cognitive deficits did not appear to be affecting his learning abilities or academic achievement.  She did note that his attention problems "are greatly affecting verbal learning and memory as he is significantly affected by sensitivity to overload as well as difficulties organizing new information to aid in memory."  Although she made several recommendations for C.D., she did not have information about C.D.'s school performance.  C.D. reported to her that when he got home from school, he was so tired he could not do anything.

13

On February 22, 2007, Dr. Rudin issued a summary report of a teleconference that he had with C.D.'s parents, Dr. Viscovich, Dr. Trapane, LuAnn Weik (a genetic counselor), Dr. Plumb and Kratz.  He wrote that the providers discussed how C.D.'s physical and psychological issues would cause him to overexert himself and experience pain, fatigue, troubles with attention and possibly anger, resulting in a decrease in his educational performance.  Dr. Rudin noted that it was unclear how well C.D. could sustain performing at grade level and stated that he needed more information from the school.

In a March 10, 2007 letter to the school district, Dr. Rudin wrote that C.D. "should be able to perform adequately at school if his environment is adapted to meet his complex physical and cognitive/behavioral needs."  The report reiterated that C.D. should avoid high-impact activities (repetitive jumping and running, running sports, joint traction), have modifications to avoid joint overstress and perform more demanding activities toward the end of the day.  He reported that the providers had understood that C.D. was experiencing pain and fatigue at school similar to that at home.  They recommended that the school district avoid physically overloading C.D., provide him with alternative activities and rest breaks, minimize his emotional stress, promote his attention using cognitive-behavioral strategies and keep a record of his activity and attention throughout the school day.  Dr. Rudin also noted that C.D. demonstrated the ability to perform acceptably at school when his pain level was low, he was well rested and he was paying attention. On March 16, 2007,

14

after a conversation with three school district officials, Dr. Rudin revised his letter to add that the providers realized that an individualized education program was an educational and not a medical decision.

Pingel reviewed Dr. Rudin's January, February and March reports and concluded that his recommendations did not require her to alter anything she was doing with regard to C.D.'s physical education activities.

Dr. Rudin terminated his doctor-patient relationship with C.D. on March 27, 2007 because of "a breakdown in the trust and communication in [the] treating relationship." The problems involved "copious parenthetical editorial comments" that Traci D. had made to the verbatim transcripts of the teleconference and another conversation that she had had with Dr. Rudin. The comments went above and beyond what Dr. Rudin had said and "were to be entered into the medical record despite not being a precise representation of what the family" and Dr. Rudin had discussed. Dr. Rudin thought that Traci D. had prevented him from communicating with the school district.

3. <u>March 2007 team meetings</u>

On March 20 and 21, 2007, the following members of C.D.'s individualized education program team met: Hansen, Pingel, Kuhl, Au, Buechner, Kerwin, Motl, Koch, Sramek and School Nurse Bendall. The team reviewed the existing evaluation data and

15

medical reports.   In addition, team members presented the following information at the

March meetings:

- Hansen observed that during 10 minute periods in the classroom, C.D. demonstrated on task behaviors 85 to 100 percent of the time as compared with a peer.

- Buechner reported that C.D. was making progress in second grade and performing at the level expected of a second grader, even though he continued to need extra time and other instructional strategies.

- Tests administered by Motl showed that C.D.'s reading performance was "in the lower middle part of his peers" and his performance in spelling, phonetics, and understanding of sounds were what she would expect of second graders.

- Kerwin reported that by the middle of second grade, C.D.'s spelling performance was consistent with "the middle of second grade performers."

- Pingel reported that the results of a questionnaire completed by C.D.'s teachers showed that C.D. was able to sustain attention and was not showing signs of fatigue in his classes.

### D.   The Team's Decision

At the March 2007 meetings, the team determined that C.D. was no longer eligible

for special education and related services.   The team used an eligibility determination

checklist and form developed by the Department of Public Instruction.   The checklist

contains four questions that must be answered affirmatively for a child to be identified as

having an "other health impairment."   In response to the first three questions, the team

16

found that C.D. had a chronic health problem that resulted in limited strength and vitality but that his educational performance was not adversely affected as a result. (The checklist does not require that the child's health condition "significantly" adversely affect his or her educational performance.) The team reported on the form that:

> Current assessment, coupled with teacher report and observation, reveals that [C.D.] demonstrates reading, writing, math, spelling and physical abilities that fall within the average range on standardized and curriculum-based measures. In addition, with modification and accommodations provided by regular education staff, [C.D.] is able to demonstrate age-expected success in the regular education curriculum.

Although it was not required to do so, the team went on to assess whether C.D. continued to need special education. The team noted in its report that he did not have any needs that could not be met by regular education as long as the following modifications could be made: 1) avoid physical overload and provide alternative activities and rest breaks when needed; 2) use cognitive-behavioral strategies to minimize emotional stress and promote attention; and 3) use a record to monitor his daily progress. The team also noted that Dr. Rudin would be providing other specific physical restrictions for C.D.

D. Administrative Hearing

On August 2, 2007, C.D. filed a request with the Department of Public Instruction for a due process hearing to contest the school district's decision. The State Division of

17

Hearings and Appeals conducted the hearing over eight days in October, November and December 2007.  Administrative Law Judge Sally Pederson heard testimony from several witnesses and extensively questioned the school district employees.

Dr. Sramek, the school district's Superintendent and Director of Pupil Services and Special Education, testified that she attended the March 2007 individualized education program meetings.  She testified that she agreed with other school district members that C.D.'s health condition did not adversely affect his academic achievement, behavioral performance and motor skills because he was performing within the average range.  In her professional opinion, "adverse effect" requires the team to consider to what extent C.D.'s performance in a given area falls outside the range of typical or average performance.  She testified that a "significant effect" is one that "parts from the average range."  Other school district members of the team testified that this was their understanding of the term.  Dr. Sramek disagreed that an adverse effect was "any effect;" that interpretation would be very broad and inappropriate, resulting in virtually every child being "adversely affected."

Dr. Sramek testified that she believed that C.D.'s needs could be met in the regular classroom and did not require "specially-designed instruction."  She stated that she did not know whether the team thought it was appropriate to consider how C.D. would perform in the absence of the modifications that had been made for him because those modifications were not specialized instruction; they were "things that good teachers do typically in the

18

classroom." She stated that C.D.'s potential for joint injury and fatigue could be addressed through a health plan jointly developed by the school nurse, his parents and classroom teachers, other school personnel and his physicians. According to Dr. Sramek, the district had developed an individual health plan for C.D. in May 2007. In her opinion, adaptive physical education is adapted or modified activities and methods within the physical education environment. Dr. Sramek believed that the team considered C.D.'s limitations and accurately determined that he could engage safely in physical education and perform the required skills. However, Pingel testified that she did not recall the team considering whether C.D.'s performance of non-academic activities affected his safety or worsened his health condition.

The special education coordinator, Koch, testified that in her opinion, the team looks at a child's educational performance as compared to that of his same-aged peers when determining whether there is an adverse affect. She explained that adversely affected means that "the student isn't benefitting from the regular interventions and instruction in that classroom, that they are significantly different from their peers, and they're not making progress, for example, or their skills are so significantly different that they need specialized instruction." Koch also testified that:

> I don't think that . . . a great deal of our conversation was related to the accommodations. I think the conversation was about the adversely affecting and looking at those three areas [performance, strengths and weaknesses and

what was working and not working].   They were mentioned, the accommodations that happened were mentioned, because as I said, it was the teaching process.

. . .

I think the accommodations were minor, and that his performance was in the average range, but certainly there was discussion about the accommodations and the impact on his performance.

In reaching her opinion that C.D.'s health condition did not affect his academic achievement, Koch relied on the data presented by Buechner and Motl that C.D. was functioning in the average range as compared to his peers in all academic areas.  Relying on Dr. Viscovich's report and the classroom teachers' observations, Koch concluded that C.D.'s behavioral performance was not adversely affected.  She also testified that she had reached this conclusion from the reports of the occupational and physical therapists, the adaptive physical education teacher and the classroom teacher that C.D.'s skills were in the low average to average range.  Koch testified that she thought the team considered how tired C.D. became after activities in physical education class.  The school district members of the team all reached the same conclusions.

The special education teacher, Kerwin, considered the assessment reports provided by the other team members in determining that C.D. was not eligible for special education.  His academic and motor skills were in the average range for a second grade student and he could complete age-appropriate skills when modifications were provided by the classroom, music

20

or physical education teachers.  She explained that supplemental instruction is regular education in addition to the core curriculum to provide a child with more opportunity to work on a specific skill.  Kerwin testified that when regular classroom modifications were provided by Buechner, C.D. was able to show age-specific performance.

1.  Academic performance

Buechner testified that she noticed that C.D. told her that he did not feel good when there was a task that he perceived as challenging.  When he was sick, he took more time getting his work done and needed more assistance.  By February 2007, she observed that C.D. was feeling better.  He did not complain to her about feeling sick to the extent that he complained about it at home.  Buechner testified that C.D. probably became tired on a more regular basis than the other children but she did not think that his degree of tiredness was that different from the other children's.  Like most students, he was tired by the end of the day.  In her opinion, C.D.'s energy level did not depend on when he had physical education during the day.  She stated that he would mention several times a week that his tummy, head or eye hurt.  Buechner responded by offering him the option of lying on the couch for a few minutes.  Usually, he was ready to return to the group after about five to 10 minutes.  She never observed C.D. having such severe pain that it prevented him from participating in the first grade classroom or required him to be carried.

Buechner testified that the recommendations made by Dr. Viscovich were things that she was doing in her classroom. She used redirection or read directions to get C.D. back on task. In her opinion, these modifications did not require the training of a special educator. C.D.'s attendance problems were manageable and he did not have behavioral problems. Buechner testified that because C.D. had received supplemental aids and services during first and second grade, she did not know how he would perform academically if they were not provided.

Kerwin testified that by the middle of second grade, C.D. was reading in the middle to late letter name alphabetic stage, which was consistent with the middle of second grade performers. She concluded that he had progressed to the word pattern stage; this conclusion was consistent with the opinions of Motl and Buechner. School district testing administered in the spring of 2007 showed that C.D. had a "lexile score" of 44 to 194, which would place him at the kindergarten level. However, two school district employees testified that the school district does not rely on lexile scores for determining student performance.

2. Physical education performance

Pingel testified that adaptive physical education is specially designed instruction for children with disabilities to help them develop the gross motor skills necessary to perform within the physical education curriculum. She explained that specially designed instruction

22

is one-on-one instruction based on an individualized education plan, using visual, verbal or physical cues to help a student perform gross motor skills.  For example, she may break down the skill of shooting a basket by teaching a student the subskills of holding the ball and pushing the ball straight up into the air.  Pingel also stated that she identifies any different equipment that the student may need, such as a lighter ball or one that is brightly colored.  She testified that adaptations are what she does for a child to allow him to succeed within the curriculum, whereas modifications are changes such as reducing the number of repetitions and shortening the length of time for certain activities.  Dr. Sramek clarified that adaptive physical education could be provided to a group of students.  Pingel agreed that a child needs adaptations if he is unable to perform safely a physical education activity designed to develop strength, agility or dexterity.

Pingel testified that the modifications that C.D. needed could be provided by a regular physical education teacher because such teachers are trained to do that for children with health concerns.  She testified that no health care provider ever told her that C.D. could not run at all.  Pingel testified that C.D.'s health condition did not prevent him from obtaining the skills in the curriculum because he was able to perform them within the average range.  "If he was significantly adversely affected, he would have trouble producing these skills . . . [but C.D.] was performing in the average range, that he was not adversely affected."  Although she testified that safety issues are a concern for physical education teachers, she

23

stated that whether C.D. could perform physical education activities safely did not affect her decision about whether he needed special education.  Pingel stated that she understood that overexertion at school could result in C.D.'s being fatigued at home.  She testified that she had considered reports that C.D. was extremely fatigued and unable to get off the couch at home in making her determination about his eligibility for special education.

### 3.  Medical experts

On April 11, 2007, following the team's decision, Dr. Janice Cain, a psychologist, evaluated C.D. and reviewed the reports of Dr. Rudin and Dr. Viscovich.  She testified that she continued to treat C.D. for pain and fatigue, and by June 2007, she realized that he suffered from separation anxiety disorder.

Physical Therapist Au testified that C.D.'s core strength in December 2006 was pretty close to normal for his age.  Although she agreed that C.D. needed modifications to participate in physical education, he did not need adaptation, which she considered to be rearranging a full activity when a child is not able to participate without special equipment and special rule changes.  She would not recommend that he do much running or many jumping jacks or push ups.  Au testified that C.D.'s needs were more medical than educational and that he did not need school-based therapy if he had private therapy.  She

24

stated that she agreed with the team because C.D. was functioning "quite well" with "significant modifications or accommodations to programming."

Kuhl testified that C.D. continued to need strategies at school for joint protection and energy conservation, including modified written assignments, enhanced task features, contextual cues and use of a rocker chair, slantboard, pencil grip and keyboard. She stated that she would have recommended more restrictive activities than Dr. Rudin had. She described Dr. Trapane's recommendations as "ideal." Kuhl stated that in the fall of 2006, she and Buechner had concerns about C.D.'s ability to attend school. However, she testified that the shoulder strengthening exercises that she did with C.D. enabled him to keep his arms up to write across the whole length of a chalkboard. She also stated that he significantly improved his endurance and trunk strength. Kuhl testified that although C.D. needed occupational therapy, he did not need to obtain it through the school system.

Kratz testified that in the first telephone conference with Dr. Rudin in 2007, he stated that C.D. was his first pediatric patient with Ehlers-Danlos Syndrome and that he did not know what an individualized education program was. Kratz testified that C.D. had to learn self-management techniques but that he still needed adult supervision because developmentally, he was too young to understand that when he overextends himself during the day, he will experience pain and fatigue in the evening.

25

Dr. Trapane testified that the majority of her patients are children and quite a few of the clinic's patients had Ehlers-Danlos Syndrome.  She stated that people with this syndrome commonly suffer from headaches, stomach aches, depression and emotional decompensation when fatigued.  Dr. Trapane testified that the condition often includes low-level damage to joints, early-onset arthritis, joint pain and easy fatigability.  Even when the joints are not injured, the body's muscles become easily fatigued because they are working to keep the joints in place.  She stated that C.D.'s condition places him at a very high risk of early injury with long term complications.  Dr. Trapane noted that C.D.'s mother reported that he had been suffering from increased pain and joint dysfunction, hyperextensibility of the large and small joints, reflux, sensory integration disorders, decreased endurance and increased fatigue.  She testified that self-reports are the only clinical means of assessing pain and fatigue.

Dr. Trapane explained that teachers do not necessarily see fatigue in children with Ehlers-Danlos Syndrome because they become fatigued at the end of the school day and often sleep two to four hours in the late afternoon or early evening.  She stated that C.D.'s susceptibility to viruses was not directly related to his Ehlers-Danlos Syndrome but that people who are fatigued have a decreased immunity, causing them to pick up infections and not fend them off as well as others.  According to Dr. Trapane, two to three upper respiratory viruses a year would be expected in a seven-year old child.

26

Dr. Trapane admitted that she has no experience or training in special education and never observed C.D. in the classroom. Although she relies on a popular textbook to make general recommendations for her clients with various genetic conditions, she makes almost weekly recommendations to school staff for children with genetic disorders. Dr. Trapane described her written recommendations to the team regarding C.D. as "very generalized" and stated that she had planned to provide specific recommendations in a collaborative care plan from various providers. The purpose of modifying his curriculum was to protect his joints and overall health. Dr. Trapane testified that C.D. should do wall push ups instead of floor push ups, preferably with the teacher directing him. She also recommended modifying curls, sit ups and jumping jacks. She stated that his play at recess should be well monitored and well directed to make sure that he made correct choices. On April 5, 2007, after the individualized education program team meeting, Dr. Trapane issued a recommendation that C.D. avoid running and jumping.

Dr. Rudin testified that Traci D.'s reports of C.D. being fatigued to the point of non-functioning, having difficulty functioning, becoming impulsively angry and having headaches and low-grade temperatures were not symptoms of Ehlers-Danlos Syndrome. He stated that he was surprised to learn that C.D. had missed only four days of school during his bout of pneumonia because Traci D. had reported that C.D. had multiple illnesses in the 2006 to 2007 school year. He also could not understand how C.D.'s attention and musculoskeletal

27

limitations "translated into the degree of difficulty reported by the family."  "[T]he degree of confusion over his symptoms, the conflicting reports on what's going on and the, frankly, extremely controlling behavior exhibited by his parents all raise concerns that we can't take the emotional impact of this on [C.D.] and his family out of the rest of the physical situation."

Dr. Rudin testified that he had prepared a summary of recommendations for accommodations dated March 27, 2008 and a final report dated March 28, 2007.  However, he never sent either report to the school district because Traci and Brian D. had revoked their consent for him to communicate with the school.  In the reports, Dr. Rudin recommended that C.D. rest for five to 10 minutes if he became fatigued during recess or gym; try a less physically intensive activity on his own if his fatigue did not improve; avoid activities like hockey, basketball, soccer, football, jumping jacks, wrestling and gymnastics; and not be pulled along on a scooter.  He testified that if C.D. was too tired to walk between classes, "he is probably too fatigued to perform well and should be resting."  Dr. Rudin stated that C.D. should be allowed to walk, climb, run on a level surface and do push ups and sit ups.

Dr. Rudin testified that Dr. Trapane's recommendations were consistent with his own, except that he disagreed with her recommendation that C.D. should avoid running.  After seeing C.D. a few times, he thought that he would be able to run within limitations.  He testified that he "would start him with short distance running on level surfaces, avoid uneven

28

terrain and have him gradually increase his running time and see how he did, basically try to set a range within which he felt comfortable." Dr. Rudin stated the opinion that C.D.'s "joints were fairly well held in place, and his muscles, if conditioned will be strong enough to help hold them." "My hope was that we could teach him how to [run] safely and within a range of what is comfortable with him without harming him."

Dr. Rudin testified that C.D. could not participate safely or fully in a regular, unadapted second-grade gym class with no accommodations. He stated that careful intervention was necessary at C.D.'s young age to decrease his functional impairment and improve his chances for a normal life. He testified that having alternative physical education is important when the modification to physical education is having the child sit out rather than participate in a potentially harmful activity. In his opinion, a private physical therapy provider could work with C.D. on his recommendations relating to increasing C.D.'s postural awareness, upper body strength, postural stabilizer strength, proprioception and safety.

### E. Administrative Law Judge Decision

On February 18, 2008, the administrative law judge issued a decision finding that the school district improperly determined in March 2007 that C.D. was no longer eligible for special education and related services under the Individuals with Disabilities Education Act. The adjudicator determined that C.D. met the eligibility criteria for "other health

29

impairment" and needed special education and related services.  She ordered the school district to develop an individualized education plan for C.D..

The administrative law judge found that the individualized education program team applied the wrong legal standard in determining C.D.'s eligibility under the Act by improperly requiring that C.D.'s health condition have a "significant" adverse affect on his educational performance.  Although she found that the team reliably assessed C.D. and reviewed all the existing evaluation data, she disagreed with the way the team interpreted his present level of achievement.  She found that there was a great deal of credible evidence that C.D.'s health condition adversely affected his educational performance, including 1) the reports and testimony of Au, Kuhl and Kratz that C.D.'s health condition adversely affected him in school; and 2) reports from Au, Kuhl, Kratz and C.D.'s physicians that he experienced pain and fatigue that might affect his educational performance.

Although the administrative law judge recognized that Au, Kuhl and Kratz agreed with the team's decision, she found that they were persuaded by C.D.'s average academic performance, which he had achieved with the help of many modifications and accommodations provided by his regular education teacher and his adaptive physical education teacher.  The adjudicator noted that Buechner testified that C.D. performed anywhere from low to low average to average even with the modifications and admitted that she did not know how well C.D. would perform academically without them.  The

30

administrative law judge discredited Pingel's evaluation of C.D. because Pingel had focused on whether C.D. could perform a particular skill rather than on his developmental needs. Finally, she criticized both Pingel and the team for failing to consider whether C.D. could perform physical activities safely or whether performing them might worsen his health condition.

With respect to the team's decision that C.D. no longer needed special education, the administrative law judge found that the preponderance of credible evidence supported the conclusion that C.D. could not safely engage in unrestricted participation in various activities of the regular physical education program.  In support of her decision that C.D. continues to need specially designed physical education, the administrative law judge noted that:

- Pingel made many adaptations and modifications to enable C.D. to participate in physical education;

- Pingel frequently conferred with Au and C.D.'s regular physical education teacher about how to modify activities to meet his needs; and

- C.D.'s physicians and therapists reported that he needed adapted and modified physical activities.

The administrative law judge was not persuaded by Pingel's testimony that C.D. did not need one-on-one adaptive physical education and that the regular education teacher could provide the modifications that C.D. needed.  Citing the Wisconsin Department of Public Instruction Information Update Bulletin 02.02, she noted that specially designed or adaptive

31

physical education is not limited to one-on-one services or services provided by an adaptive education teacher.

## F.  Post-Hearing

After the hearing, it was discovered that Kratz was not a licensed occupational therapist at the time she treated C.D. and prepared her reports.  On April 19, 2000, the Wisconsin Medical Examining Board issued a final decision and order disciplining Kratz and suspending her license for 30 days and placing limitations on her license for five years. Kratz's license expired on October 31, 2005, during the five-year period.  Kratz claimed that allowing her license to lapse was inadvertent because she did not receive a renewal notice. Although the board lifted the restrictions on her license on July 25, 2006, it remained expired, making her ineligible to practice as an occupational therapist.  At the hearing, Kratz testified that she was a licensed occupational therapist in the state of Wisconsin and had provided C.D. with therapy that required her to be licensed.  Her license was restored in March 2008.

In an order dated March 28, 2008, the administrative law judge denied a motion for reconsideration filed by the school district, finding that although Kratz's failure to maintain a valid license indicated a lack of organization and attention to detail, she did not knowingly commit perjury at the hearing.  Accordingly, the adjudicator did not find a basis for

discounting all of her testimony as untruthful or irrelevant.  She also noted that even without Kratz's opinions, her decision would not change.  The administrative law judge pointed out that she did not rely in large part on Kratz's testimony and noted that there was substantial testimony from several other witnesses (especially the school district's witnesses) to support her findings.

OPINION

A.  Standard of Review and Burden of Proof

In reviewing administrative agency decisions under the Individuals with Disabilities Education Act, the court shall 1) receive the records of the administrative proceedings; 2) at its discretion, admit additional evidence at the request of a party; and 3) base its decision on the preponderance of the evidence, granting relief that it determines to be appropriate.  20 U.S.C. § 1415(i)(2)(C); Board of Education v. Ross, 486 F.3d 267, 270 (7th Cir. 2007). Although the court must independently determine whether the requirements of the Act have been satisfied, it must give "due weight" to the results of the administrative decisions and not substitute its "own notions of sound educational policy for those of the school authorities which they review."  Board of Education of Hendrick Hudson Central School District v. Rowley, 458 U.S. 176, 206 (1982)); see also Ross, 486 F.3d at 270 (citing Rowley standard); Alex R. v. Forrestville Valley Community Unit School District No. 221, 375 F.3d 603, 611-

33

12 (7th Cir. 2004) (same).  The Court of Appeals for the Seventh Circuit has interpreted "due weight" to mean that courts must review the state hearing officer's findings of fact deferentially.  Ross, 486 F.3d at 270; Heather S. v. State of Wisconsin, 125 F.3d 1045, 1053 (7th Cir. 1997); Board of Education of Murphysboro Community Unit School District No. 186 v. Illinois State Board of Education, 41 F.3d 1162, 1167 (7th Cir. 1994).  However, the meaning of "due weight" varies from cases to case, depending on how much the court relies on evidence that was not before the hearing officer.  Alex R., 375 F.3d at 612.  For example, when a reviewing court does not take new evidence and relies solely on the administrative record, it owes considerable deference to the hearing officer and may set aside the administrative order only if it is "strongly convinced that the order is erroneous."  Id. (quoting School District of Wisconsin Dells v. Z.S., 295 F.3d 671, 675 (7th Cir. 2002), and noting that standard analogous to that of clear error or substantial evidence).  The more the court relies on new evidence, the less it should defer to the administrative decision and instead act as the factfinder.  Id.

As the school district points out, any questions of law are reviewed de novo.  Ross, 486 F.3d 270.  At the administrative hearing, C.D. bore the burden of persuading the hearing officer that the school district made an erroneous decision.  Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 57-58 (2005).  However, as the party challenging the outcome of the state administrative decision, the school district bears the burden in this case.  Id.

34

B. New Evidence

The school district asserts that both parties have submitted "new evidence" that was not considered by the administrative law judge.  Specifically, the school district seeks to introduce C.D.'s 2008 individualized education program and evidence related to Kratz's expired occupational therapist license.  Although C.D. also submitted evidence relating to Kratz's licensure, he disputes the school district's assertion that there is new evidence before this court.  C.D. contends that the administrative decision is entitled to considerable deference because the evidence before the court was part of the record considered by the administrative law judge.

In a proceeding under the Individuals with Disabilities Education Act, a district court is not required to consider evidence that was not considered by the hearing officer.  A.S. v. Madison Metropolitan School District, 477 F. Supp. 2d 969, 971 (W.D. Wis. 2007).  The determination whether to allow additional evidence under § 1415(i)(2) is left to the discretion of the trial court.  School District of Wisconsin Dells v. Z.S., 184 F. Supp. 2d 860, 874 (W.D. Wis. 2001), aff'd, 295 F.3d 671 (7th Cir. 2002).  I agree with defendant C.D. that the evidence related to Kratz's expired license is not new because the administrative law judge considered that evidence in ruling on the school district's motion for reconsideration and determined that it would not change the outcome of her decision.  Although the 2008 individualized education program is new evidence, I decline to consider it because it was

35

prepared after the administrative hearing and is irrelevant to the situation at the time the school district found C.D. ineligible for special education services in March 2007. Accordingly, I will review the administrative law judge's factual findings deferentially.

## C.  Eligibility under Individuals with Disabilities Education Act

The Individuals with Disabilities Education Act requires that the school district provide C.D. with a free appropriate public education in the least restrictive environment. 20 U.S.C. § 1412(a)(1) and (5).  A free appropriate public education comprises 1) special education and 2) related services.  20 U.S.C. § 1401(9).  "Special education" is defined as "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including (A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and (B) instruction in physical education."  20 U.S.C. § 1401(29).  "Related services" are defined as developmental, corrective and other supportive services (including physical and occupational therapy, recreation and orientation and mobility services) required to assist a child with a disability to benefit from special education.  20 U.S.C. § 1401(26).

The Supreme Court has held that a state satisfies the free appropriate public education requirement if it provides personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction.   Rowley, 458 U.S. at 203.

Recognizing the difficulty in determining whether a school system has met its burden under the Act, the Court noted that the school's grading and advancement system "constitutes an important factor in determining [whether a child is receiving an] educational benefit." Id. The educational benefit does not have to be meaningful or significant. A.S. v. Madison Metropolitan School District, 477 F. Supp. 2d 969, 979 (W.D. Wis. 2007) (rejecting higher standard of "meaningful educational benefit"); see also Hjortness ex re. Hjortness v. Neenah Joint School District, 507 F.3d 1060, 1065 (7th Cir. 2007) (noting standard set forth in Rowley still applicable); Z.S., 295 F.3d at 677 (same). However, it should be noted that the school district is required to provide only an appropriate education, not the best possible education or the placement that the parents prefer. Heather S., 125 F.3d at 1057 (internal citations omitted).

    The Individuals with Disabilities Education Act and Wisconsin special education laws set forth extensive procedures that a school district must follow when evaluating whether a student is a "child with a disability" who is eligible for special education and related services. 20 U.S.C. §§ 1414(b), 1415; Wis. Stat. § 115.782. A "child with a disability" must have one of several listed impairments and, by reason thereof, need special education and related services. 20 U.S.C. § 1401(3). In addition to an initial evaluation, the local education agency must reevaluate a child with a disability at least every three years but not more than once a year unless it and the child's parents agree otherwise. 20 U.S.C. § 1414(a)(2)(B). The

37

reevaluation occurs either at the request of the child's parents or teacher or when the school district determines that it is warranted by the child's educational or related services, including his improved academic achievement and functional performance. 20 U.S.C. § 1414(a)(2)(A). When conducting a reevaluation, a school district must gather relevant functional, developmental and academic information to determine whether the student continues to meet the definition of a "child with a disability" and, if so, develop the content of his individualized education program (commonly referred to as the IEP). 20 U.S.C. 1414(2); see also Wis. Stat. § 115.782(2) (establishing similar requirements under state law). Evaluations are conducted by an individualized education program team, which usually consists of the child's parents and qualified professionals, including a regular education teacher, a special education teacher, a representative of the local education agency, an individual who can interpret the instructional implications of the evaluation results and other individuals who have knowledge or special expertise regarding the child. 20 U.S.C. §§ 1414(b)(4), (c) and (d)(1)(B).

At issue in this case is whether C.D. continues to be a child with a disability. Neither Ehlers-Danlos Syndrome nor attention deficit hyperactivity disorder is a listed impairment under the Act. Instead, C.D.'s health condition falls within the general category of "other health impairment." § 1401(3)(A)(i). Regulations issued by the Department of Education define "other health impairment" as limited strength, vitality or alertness, including a

heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment that is caused by chronic or acute health problems and adversely affects a child's educational performance.  34 C.F.R. § 300.8(c)(9).  Although the parties agree that C.D. has a health problem, they disagree on whether it adversely affects his educational performance and whether, as a result, he needs special education and related services.  I will address each of these issues separately.

1.  <u>"Adversely affects" requirement</u>

a.  Legal standard

The administrative law judge found that the individualized education program team applied the wrong eligibility standard because it determined that the adverse effect on C.D.'s health condition was not "significant."  The administrative law judge pointed out that the Department of Public Instruction eligibility form for other health impairments does not modify the phrase "adversely affects" with "significant."  The school district asserts that the administrative law judge was required to rely on the definition of "adversely affects" applied by the highly qualified educational experts making up C.D.'s individualized education program team, which was whether his educational performance fell outside the average range for his same-aged peers.

Neither the Individuals with Disabilities Education Act nor the regulations define "adversely affects," leaving the states to give meaning to this term. Mr. I. ex rel. L.I. v. Maine School Administrative District No. 55, 480 F.3d 1, 11 (1st Cir. 2007); J.D. ex rel. J.D. v. Pawlet School District, 224 F.3d 60, 66 (2d Cir. 2000). Wisconsin closely follows federal law and has not defined the meaning of "adverse." Wis. Stat. § 115.76; Wis. Admin. Code §§ PI 11.35 and 11.36. As the school district correctly notes, only one federal circuit appears to have addressed this issue. The Court of Appeals for the First Circuit interpreted adverse effect to be any negative impact, however slight, reasoning that the term appears in the regulations without a qualifier such as significant or marked. Mr. I, 480 F.3d at 13; see also R.C. v. York School Department, 2008 WL 4427194, *19 (D. Me. Sept. 25, 2008) (citing standard set forth in Mr. I). Although the school district spends several pages of its supporting brief arguing why this court should not adopt a similar interpretation, I do not find its arguments persuasive.

The school district attempts to distinguish Mr. I from the instant case on the grounds that in that case, the court focused on the student's extensive academic and functional problems and excellent academic performance, was not asked to reach the issue whether the student required special education in order to benefit from his education and was not asked to consider how the school district's compliance with the procedural requirements of the act contributed to the team's conclusion that the student was not a "child with a disability." The

40

school district has not explained adequately how these differences would have affected the court's interpretation of the federal regulations. The court of appeals made clear that it was refusing to adopt a more restrictive definition of "adversely affects" because the regulations did not contain such a requirement. Neither the student's particular impairments nor the actions of the individualized education program team significantly factored into the court's decision.

The school district asserts that a properly convened individualized education program team of qualified professionals should be the ones to interpret the eligibility criteria. In support, the school district cites the Supreme Court's directive in Rowley, 458 U.S. at 206, that a reviewing court may not substitute its own notions of educational policy for those of the school authorities they review. It also notes that the Court has held that schools are not required to maximize a child's educational benefit. Id. at 200. However, the Court made both statements in the context of deciding what constitutes "appropriate education" under the Act, not eligibility criteria. Further, in interpreting the meaning of appropriate, the Court looked to the statute itself, noting that although the statutory definition was cryptic, "that is scarcely a reason for abandoning the quest for legislative intent." Id. at 189. Similarly, courts in this circuit, including this court, have refused to define the term "educational benefit" more restrictively than the statute itself. A.S., 477 F. Supp. 2d at 979. Presumably, if Congress had wanted to qualify the term educational benefit, it would have done so. I will

41

not add a restrictive qualifier to the term "adversely affects" when the statute or regulations fail to do so.

As the school district did in <u>Mr. I</u>, the school district here contends that an unqualified interpretation of "adversely affects" makes the scope of its liability impermissibly broad, apparently inferring that every child with one of the impairments listed in the statute will qualify for services under the Act. <u>Mr. I.</u>, 480 F.3d at 13. However, as the school district has argued extensively in its supporting brief, the Act's eligibility standard requires not only that the child have one of the listed conditions that adversely affects his educational performance, but that the child needs special education. § 1401(3)(A). Like the court in <u>Mr. I.</u>, 480 F.3d at 14, I find that interpreting the regulations as requiring any adverse effect is unlikely to result in an excessive amount of claims under the Act.

In a final argument, the school district cites <u>Arlington Central School District Board of Education v. Murphy</u>, 548 U.S. 291, 296 (2006), in which the Supreme Court found that "when Congress attaches conditions to a State's acceptance of federal funds" pursuant to the Spending Clause of the United States Constitution, "the conditions must be set out unambiguously." In <u>Mr. I.</u>, 480 F.3d at 14, the court of appeals rejected this argument, finding that given the Act's express definition of "child with a disability," the "statute sufficiently articulates the first prong of the standard for IDEA eligibility and, in so doing, adequately informs the states of the extent of their obligations." Even assuming that the term

42

"adversely affects" is ambiguous and may result in over-identification of children with disabilities under the Act, it is not this court's role to restrict the eligibility standard when neither Congress nor federal regulators have chosen to do so.  See id. at 15 (noting statutory and regulatory eligibility criteria did not change after 1997 and 2004 amendments to Act).

Accordingly, I do not find that the administrative law judge applied the wrong eligibility standard in C.D.'s case.


b.  Evidence of adverse affect

The administrative law judge found substantial, credible evidence from the therapists and physicians that C.D.'s health condition affected his educational performance adversely. The school district criticizes the administrative law judge for placing too much weight on the medical opinions and failing to give due weight to the educational experts on the individualized education team.  The school district points out that all of the school district members of the team, including the school therapists, agreed that C.D.'s average performance and overall improvement showed that his health condition did not have an adverse affect on his educational performance.

The school district is correct that an administrative law judge must give due weight to the opinions of school officials and not substitute her own opinion for theirs merely because she thinks they were mistaken.  Z.S., 295 F.3d at 676.  However, "[a]dministrative law judges

43

in Wisconsin who hear IDEA cases are . . . specialists, *see* Wis. Admin. Code § PI 11.12(2), and are not required to accept supinely whatever school officials testify to." Z.S., 295 F.3d at 676 (citations omitted).  In the instant case, the administrative law judge appropriately recognized that the physicians and therapists were not educational professionals but nevertheless found their statements credible and persuasive.  Giving the administrative law judge's decision due weight, I find that it is supported by a preponderance of the evidence and not clearly erroneous.

The administrative law judge considered and weighed all of the evidence and provided good reasons for her conclusion that C.D.'s health condition had an adverse effect on his educational performance.  She cited the December 2006 tests administered by Au that showed that although C.D. had average manual coordination, his body coordination, strength and agility were below average to low average.  Au also reported that given Traci D.'s reports that C.D. tired more easily in the afternoon, he may not have performed in the average range had he taken the tests in the afternoon.  Au concluded that C.D. would need physical therapy and modifications to his physical activities.

The administrative law judge noted that although Kuhl's tests indicated that C.D.'s visual motor integration and perceptual skills were in the average range, she found his performance very dependent on his health condition.  Kuhl also stated in her report that C.D.'s symptoms affected his ability to perform successfully at school.  The administrative

44

law judge relied on the opinions of C.D.'s physicians, who described the extent of his health condition and stated that his joint instability and resulting pain and fatigue would affect his ability to perform certain activities fully and safely. All of the physicians recommended restricting or otherwise modifying C.D.'s activities at school. Finally, the administrative law judge included string citations identifying several pages of the administrative record that supported her decision. The string citation included citations to Kratz's testimony and report and Dr. Cain's testimony.

The school district argues that none of the witnesses, except Kratz, personally observed C.D.'s fatigue, relying solely on the reports from his parents. The school district further asserts that no school district employee observed the level of fatigue at school that Traci D. described as occurring at home. However, as Dr. Trapane testified at the hearing, self-reports are the only clinical measures of pain and fatigue in Ehlers-Danlos Syndrome patients. She further explained that teachers often do not see fatigue in these patients because it tends to occur at the end of the day. The school district points out that Dr. Trapane saw C.D. only once, based her opinions on her general knowledge of people with Ehlers-Danlos Syndrome and made very general recommendations about modifying C.D.'s environment to meet his needs. However, her opinion was consistent with that of the school district's own witnesses, including Dr. Rudin and Kuhl, who both testified that they generally agreed with her recommendations. Although Dr. Rudin disagreed with Dr. Trapane's opinion that C.D.

45

should avoid running, he agreed with her other recommendations.  Further, even though he stated that C.D.'s extreme fatigue, as reported by Traci D., was not a symptom of Ehlers-Danlos Syndrome, he did not question whether it existed.  In fact, he testified that C.D. had poor muscle strength and stability and could not safely or fully participate in physical education without modifications.

The school district contends that the administrative law judge failed to distinguish between C.D.'s regular childhood illnesses and the effects of his Ehlers-Danlos Syndrome. In support of its argument, the school district cites Dr. Plumb's January 2007 letter in which she stated that C.D. experienced intermittent periods of difficulty but had been healthy for the past two years.  Dr. Plumb noted that during the second grade, C.D. had undergone three courses of antibiotics for various infections and had been more fatigued and irritable.  The school district also cites Kuhl's report that C.D. performs well when he is healthy.  Although these reports show that C.D. clearly felt worse and performed more poorly when he had a sinus infection or pneumonia, neither establishes that his Ehlers-Danlos Syndrome no longer affected him.  In fact, Dr. Trapane testified that people who are fatigued have a decreased immunity, causing them to pick up infections and not fend them off as well as other people.

The school district asserts that even with his health condition, C.D. was able to perform within the average range as compared with his same-aged peers.  It notes that none of C.D.'s private physicians, except Dr. Viscovich, talked with any school professionals about

46

C.D.'s performance, but relied solely on the reports of his parents.  Although Dr. Viscovich tested C.D.'s cognitive functioning and reading abilities, she found them to be within normal limits.  The school district points out that even though C.D. tested below average on some of Au's tests, Au stated the opinion that his fine motor difficulties and postural problems in class did not affect his ability to learn.  The school district further asserts that Au and Kuhl agreed with the team's eligibility determination and admitted that C.D.'s therapy did not have to be provided in the school setting.  Although the administrative law judge acknowledged these facts, she did not find them persuasive.  I do not find this conclusion erroneous.

The administrative law judge recognized that the school district members of the individualized education program team were persuaded by evidence of C.D.'s average performance.  Although she did not dispute C.D.'s achievements, she found that he made them with the help of many modifications and accommodations provided by his regular education teacher and his adaptive physical education teacher.  The record supports this finding.  In its written decision, the team stated that C.D. was "able to demonstrate age-expected success in the regular education curriculum" with modification and accommodation provided by regular education staff.  Au stated that she agreed with the team because C.D. was functioning "quite well" with "significant modifications or accommodations to programming."   Kerwin testified that C.D. could complete age-appropriate skills when

modifications were provided by the classroom, music or physical education teachers. Buechner testified that because C.D. had received supplemental aids and services during first and second grade, she did not know how he would perform academically if they were not provided.  Although Dr. Viscovich did not think that C.D.'s cognitive deficits were adversely affecting him, she stated that his attention problems were greatly affecting his verbal learning and memory.  Kuhl also reported that although C.D. tested in the normal range, he continued to struggle with attention, self-regulation, endurance and fatigue and continued to need the strategies that were being provided at school.

The administrative law judge was not persuaded by Pingel's assessment of C.D. as an average performer in physical education.  She noted that Pingel testified at the hearing that she had made various adaptations and modifications to C.D.'s regular physical education class, changed the way he performed an activity and engaged in special planning, including regular conferences with the regular physical education teacher and the physical therapist. The administrative law judge found that Pingel had focused on whether C.D. could perform a particular skill, including the Presidential Fitness Challenge, rather than on his developmental needs.  She criticized both Pingel and the team for failing to consider whether C.D. could perform physical activities safely or whether performing them might worsen his health condition.  Although there is no evidence that Pingel based her evaluation of C.D. on

the results of his Presidential Fitness Challenge, the administrative law judge's other findings are supported by the record.

Citing the opinions of Dr. Sramek, Koch, Kerwin, Pingel and Buechner, the school district asserts that there is a difference between instructional strategies used in the regular classroom by regular education teachers and special education or specifically designed services. The school district also notes that many of the school district witnesses described the modifications as minor. However, the administrative law judge correctly noted that neither the regulations nor the Department of Public Instruction checklist states that modifications or accommodations should be considered in determining whether a student's health condition adversely affects his educational performance. The administrative law judge pointed out that the team seemed to be jumping ahead to the second prong of the eligibility criteria, namely whether the student needs special education.

The school district contends that the administrative law judge elevated form over substance by relying on the distinction between the prongs of the eligibility criteria and that she exhibited confusion over the meaning of the terms adaptations, modifications and accommodations. It alleges that this confusion is evidenced by the administrative law judge's examination of Kerwin and her misunderstanding of Pingel's testimony. I disagree and do not find the administrative law judge's interpretation to be incorrect. A review of the relevant portions of Kerwin's hearing testimony shows that the adjudicator merely questioned Kerwin

49

about her interpretation of the checklist in order to determine how and why she formed her opinion.  Instead of exhibiting misunderstanding or confusion, she appeared to be explaining the eligibility standard.  With respect to Pingel, the administrative law judge reasonably concluded that her assessment results were skewed by the extensive accommodations that C.D. was receiving.

The administrative law judge did not err in concluding that the team inappropriately assessed C.D.'s performance with modifications and accommodations.  Considering how a student performs with even regular classroom modifications would add an additional hurdle to the first prong of the eligibility criteria.  Most students would be disqualified under the first eligibility prong if the team had to consider how they would perform with modifications.  Further, as discussed in section E below, state regulations make clear that modifications should be considered at the second prong of the eligibility criteria when the team has to decide whether a child needs special education or if his needs can be met through the regular education program as structured.  Wis. Admin Code § PI 11.35(3).

Finally, as it did in its motion for reconsideration, the school district asserts that the administrative law judge erred in finding Kratz's testimony credible because she lied at the hearing about her license being current.  The school district also objects to the administrative law judge's reliance on Dr. Cain's testimony because Dr. Cain did not treat C.D. until after the team's decision.  I do not find either argument persuasive.  It was reasonable for the

50

administrative law judge to infer from the evidence submitted after the hearing that Kratz was a credible witness. Further, the school district has not shown that the administrative law judge placed substantial reliance on Kratz's testimony in reaching her decision. As discussed above, several other witnesses reported findings similar to those of Kratz. Similarly, the administrative law judge cited to only one page of Dr. Cain's testimony in which she stated that she treated C.D. for pain and fatigue and diagnosed him with separation anxiety disorder. Several other witnesses testified at length to C.D.'s pain and fatigue. There is no indication that the administrative law judge factored C.D.'s anxiety disorder into her decision. Accordingly, any error that the administrative law judge may have made with respect to the admission of either Kratz's or Dr. Cain's testimony was harmless.

In sum, even though there was considerable evidence that C.D. was performing within the average range and had made measurable improvement in his academic and physical education classes, and another fact finder might have reached a different conclusion, this possibility is not a basis for setting aside the administrative law judge's decision. The administrative law judge reasonably could conclude from the evidence of record that C.D.'s health condition had an adverse affect on his educational performance. The school district has not shown and I do not find that the administrative law judge's decision was clearly erroneous.

2.  <u>"Needs Special Education" Requirement</u>

Neither federal nor state law explain the phrase "needs special education."  However, the federal regulations state that special education is "specially designed instruction," which is further defined as "adapting, as appropriate to the needs of an eligible child under this part, the content, methodology, or delivery of instruction– (i) [t]o address the unique needs of the child that result from the child's disability; and (ii) [t]o ensure access of the child to the general curriculum . . ."  34 C.F.R. § 300.39(3).  Wisconsin also provides some guidance in this area.  Under Wis. Admin Code § PI 11.35(3), an individualized education program team must identify the following in determining whether a child continues to be a child with a disability:

> (a)  The child's needs that cannot be met through the regular education program as structured at the time the evaluation was conducted.
>
> (b)  Modifications, if any, that can be made in the regular education program, such as adaptation of content, methodology or delivery of instruction to meet the child's needs . . . that will allow the child to access the general education curriculum and meet the educational standards that apply to all children.
>
> (c)  Additions or modifications, if any, that the child needs which are not provided through the general education curriculum, including replacement content, expanded core curriculum or other supports.

<u>See also</u> Wisconsin Department of Public Instruction Form ER-1, "Determination of Eligibility for Special Education" (including same considerations in checklist).

In addition, the Wisconsin Department of Public Instruction Information Update Bulletin 02.02 defines adaptive physical education as "a diversified program of developmental activities, games, sports, and rhythms suited to the interests, capacities, and limitations of students with disabilities who may not safely or successfully engage in unrestricted participation in various activities of the general physical education program."  (I note that Information Update Bulletin 02.02  was replaced by Information Update Bulletin 08.01 in April 2008, after the administrative law judge issued her decision.  The new bulletin does not include the same definition of adaptive physical education, instead noting that "[t]he term 'adapted' implies the process of modifying a program or service delivery to meet the needs of the student. . . . These adaptations do not require special education . . ."  Although the new bulletin may change the meaning of the term, I will apply the bulletin in effect at the time of the administrative law judge's decision.)

The administrative law judge found that C.D.'s needs could not be met through the regular education program as structured.  In support, she cited the many adaptations and modifications that Pingel made to C.D.'s physical education curriculum, the frequency with which Pingel conferred with his physical therapist and regular physical education teacher about these modifications and the opinions of his physicians that he needed adapted physical activities.  As it did with the requirement for adverse effect, the school district asserts that the administrative law judge misconstrued the accommodations and modifications provided to

53

C.D., arguing that they are regular classroom interventions and not specially designed instruction. Although the school district makes convincing arguments and another fact finder might have reached a different conclusion, I cannot say that the administrative law judge clearly erred in deciding that C.D. needed special education.

The administrative law judge reasonably could conclude that the school district specially designed the content, methodology and delivery of C.D.'s instruction to address his unique needs and ensure that he has access to the regular curriculum.  34 C.F.R. § 300.39(3). For example, his second grade teacher shortened or modified assignments and provided positioning devices and fine motor adaptations for C.D. because of his difficulty with writing and his fatigue.  Yankton School District v. Schramm, 900 F. Supp. 1182, 1190 (D.S.D. 1995) (finding similar modifications to be specially designed instruction).  She also gives C.D. frequent breaks, provides him with a rocker chair and other special chairs and alters the way she provides directions and problems to help with his attention and energy conservation. Kuhl testified that C.D. continued to need modified written assignments, enhanced task features, contextual cues and various special devices to protect his joints and conserve his energy.

Although Pingel denied specially adapting the second grade physical education curriculum for C.D., she coordinated efforts with his regular physical education teacher and physical therapist to limit or avoid certain activities that would over pound his joints.  After

54

reviewing Dr. Trapane's January 2007 recommendations, Pingel agreed that C.D.'s second grade curriculum was not consistent with them and developed a list of modifications. Although some of the modifications involved limiting the length or number of repetitions performed in an activity, others necessitated changing the rules of a game, having C.D. do an alternative activity or not allowing him to participate at all.

Au recommended that C.D. limit running, jumping jacks and push ups. Dr. Rudin and Dr. Trapane both agreed that C.D. could not participate fully or safely in regular physical education without modifications. In March 2007, Dr. Rudin recommended that C.D. avoid high-impact activities and have modifications to avoid joint stress. His goal was to teach C.D. how to run safely and within a range that was comfortable. Kuhl testified that she would have recommended more restrictive activities for C.D. than those of Dr. Rudin and found Dr. Trapane's recommendations ideal.

Dr. Rudin made clear that careful intervention was necessary at C.D.'s young age to decrease his impairment and improve his condition. He also stated the opinion that having C.D. sit out rather than participate in a particular activity was not appropriate. I agree. Without specific limitations, instruction and monitoring, C.D. would not be able to participate fully in physical education or learn how to safely manage his condition. Given the type and degree of modifications that C.D. requires, it was not unreasonable for the administrative law judge to find that he needed specially designed physical education.

55

The administrative law judge's decision also is consistent with the definition of special education or adaptive physical education provided by many of the school district employees. Dr. Sramek stated that adaptive physical education is adapted or modified activities and methodology within the physical education environment.  Pingel explained that specially designed instruction is instruction based on an individualized education plan, using visual, verbal or physical cues to help a student perform gross motor skills.  She also agreed that a child needs adaptations if he is unable to perform safely a physical education activity designed to develop strength, agility or dexterity.  Au testified that she considered adaptation to be rearranging a full activity when a child is not able to participate without special equipment and special rule changes.

In sum, all of the modifications that C.D. requires reasonably could fall within the regulatory definition of specially designed instruction and many could be construed to be at least "replacement content" under the state regulations.  Because I am not strongly convinced that the administrative law judge's decision was erroneous, it is affirmed.


D.  <u>C.D.'s Request for Hearing</u>

In his response to the summary judgment motion, C.D. requests that as a remedy, the court hold an evidentiary hearing to determine what the school district must provide him as special education under the Individuals with Disabilities Education Act.  In support of his

56

request, C.D. points out that the Act grants courts the broad discretion to grant appropriate and equitable relief.  Dkt. #28 at 3 (citing 20 U.S.C. § 1415(i)(2)(B)(iii); <u>School Committee of the Town of Burlington, Massachusetts v. Massachusetts Department of Education</u>, 471 U.S. 359, 374 (1985); <u>Board of Education of Oak Park v. Kelly E.</u>, 207 F.3d 931, 937-38 (7th Cir. 1999); <u>Parks v. Pavkovic</u>, 753 F.2d 1397, 1408 (7th Cir. 1985)).  The school district opposes this request, arguing that C.D. must first exhaust his administrative remedies before seeking court intervention or review.

The school district is correct.  A student who wants relief that is available under the Individuals with Disabilities Education Act must use the act's administrative system. <u>McCormick v. Waukegan School District No. 60</u>, 374 F.3d 564, 567-68 (7th Cir. 2004); <u>Charlie F. by Neil F. v. Board of Education of Skokie School District 68</u>, 98 F.3d 989, 991 (7th Cir. 1996); <u>Loch v. Board of Education of Edwardsville Community School District No. 7</u>, 573 F. Supp. 2d 1072, 1080-81 (S.D. Ill. 2008).  "When a party objects to the adequacy of the education provided, the construction of the individualized education plan, or some related matter, IDEA provides procedural recourse."  <u>Winkelman ex rel. Winkelman v. Parma City School District</u>, 550 U.S. 516, 127 S. Ct. 1994, 2001 (2007) (setting forth administrative process in § 1415(b) and (f)).  Although a party may bypass this requirement under certain circumstances where exhaustion would be futile, no such showing has been made in this case.  <u>McCormick</u>, 374 F.3d at 568.  C.D. never challenged the appropriateness

57

of his individualized education program and did not raise the issue at the administrative hearing.  He must first seek redress with the school district, § 1415(b)(5) and (6); only if he is unsuccessful may he then raise his claims at a due process hearing, § 1415(f).  Accordingly, C.D.'s request for a hearing is denied.

### E.  Related Case No. 08-cv-189-bbc

As a final matter, I note that in a related case in this court, Brian D. and Traci D. filed suit against the Marshall School District, seeking attorneys fees and costs as the prevailing party in the administrative hearing.  D. et al. v. Marshall School District, W.D. Wis. Case No. 08-cv-189-bbc.  Pursuant to an order entered by this court in that case on June 6, 2008, dkt. #12, all proceedings were stayed pending the resolution of the instant case.  Because the current case has been resolved, the court will schedule a pretrial conference in Case No. 08-cv-189-bbc in a separate order.

## ORDER

IT IS ORDERED that:

1.  Defendant C.D.'s motion to file his proposed findings of fact *nunc pro tunc*, dkt. #32, is GRANTED;

58

2.  Plaintiff Marshall Joint School District No. 2's motion for summary judgment, dkt. #27, is DENIED;

3.  The decision of the administrative law judge is AFFIRMED and plaintiff's appeal is DISMISSED;

4.  Defendant C.D.'s request for a hearing on the issue of whether his individualized education program is appropriate is DENIED because he has failed to exhaust his administrative remedies; and

5.  The clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered this 8th day of January, 2009.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge